# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

In re:

JOSHUA S. FREIBEL and
ELIZABETH F. FREIBEL

Debtors.

Case No. A11-00650-DMD
Chapter 7

**Filed On 5/15/12**

## DISMISSAL MEMORANDUM

The United States Trustee has filed a motion to dismiss this case for abuse pursuant to 11 U.S.C. § 707(b)(1) and (b)(2) or, alternatively, pursuant to 11 U.S.C. § 707(b)(1) and (b)(3).[1] The Blackerby creditors have filed a motion to dismiss this case pursuant to 11 U.S.C. § 707(b)(3)(A) and (b)(3)(B).[2] Paradise Shores of Bay County, LLC, filed a notice of joinder in the two motions to dismiss.[3] This court has jurisdiction over the motions pursuant to 28 U.S.C. § 1334(b) and the district court's order of reference. I find merit in the United States Trustee's motion to dismiss. This case will be dismissed unless the debtors file a motion to convert to chapter 13 within 14 days of this court's order and judgment. Because the debtors fail the means test, relief under § 707(b)(3), requested by both the Blackerby creditors and the United States Trustee, will be denied without prejudice at this time.

---

[1] United States Trustee's Mot. to Dismiss Case Pursuant to 11 U.S.C. § 701(b)(1) and (b)(2), and in the Alternative, Pursuant to 11 U.S.C. § 707(b)(1) and (b)(3), filed Nov. 28, 2011 (Docket No. 39).

[2] Am. Mot. to Dismiss Ch. 7 Proceeding Pursuant to 11 U.S.C. § 707(b)(3)(A) and 11 U.S.C. § 707(b)(3)(B), filed Oct. 31, 2011 (Docket No. 32). The "Blackerby creditors" include Robert Blackerby, Magnum Capital, LLC, and MH 1. They were all named defendants in litigation the debtors brought in the United States District Court for the Northern District of Florida (Panama City Division) in 2010.

[3] Notice of Joinder in Mot. to Dismiss, filed Mar. 23, 2012 (Docket No. 70).

Background

The debtors are Air Force officers and pilots based in Anchorage. They are well educated. Joshua Friebel has earned both a bachelor's degree and an MBA in finance. Elizabeth Friebel holds a bachelor of science degree in astronomical engineering.

The debtors' journey to bankruptcy began in 2004. Elizabeth was stationed at Tyndall Air Force Base in Panama City, Florida, between October 2004 and June 2005. She lived in Mexico Beach, Florida. while she served at Tyndall. Joshua was stationed in Georgia from August of 2004 to October, 2005. Elizabeth and Joshua were married before a Florida justice of the peace in December of 2004.[4] Elizabeth liked the Mexico Beach area and wanted to buy real estate there. She studied the real estate market extensively and persuaded Joshua that a purchase would be in their best interests. Ultimately, the debtors decided to buy a condominium in a project in Mexico Beach called Paradise Shores. This project was in the development stages at this point; nothing had yet been constructed. On July 10, 2005, the debtors entered a contract to purchase a unit in Paradise Shores for the price of $354,900.00.[5] The contract required them to pay a deposit of $70,980.00, with the balance of $283,920.00 being due upon completion of the condominium.

After the contract was entered, the debtors were stationed overseas in Japan. While they were serving there, work on the Paradise Shores project was initiated. During construction, problems arose with the concrete floors in the project.[6] The floors had

---

[4] The Friebels dispute this date. They contend their real marriage occurred on October 9, 2005, when they exchanged vows in church before their family and friends.

[5] United States Trustee Ex. K.

[6] Blackerby Ex. C27 (Judgment entered in the Florida litigation).

2

insufficient rebar and bowed slightly. The structural engineer and architect working on the project designed plans and specifications to remedy these defects. The plans were successfully implemented and the City of Mexico Beach ultimately issued a certificate of occupancy. The debtors were unaware of these construction problems until some time after they closed on their purchase.

The Friebels closed on their condominium purchase in June of 2007. For the closing, Elizabeth flew from Japan to Florida. She had a power of attorney to sign the closing documents for Joshua, who could not attend. Elizabeth inspected the unit and found it satisfactory. After closing, she purchased furnishings for the condominium and started renting the property through Parker Realty of Mexico Beach. She and Joshua also spent some time there over the next two years. The property was successfully rented into 2009, when the debtors voluntarily took the property off the rental market. They learned of the prior construction problems at that time. The Friebels say they removed the property from the rental market because they did not want to expose their tenants to a risk of harm. In 2010, the Friebels filed a civil action against the Blackerby creditors, Paradise Shores, and other parties in the United States District Court for the Northern District of Florida ("the Florida litigation"). They sought damages, recision and other relief, based upon the earlier construction issues with the condominium project.

The Florida litigation did not go well for the Friebels. They did not employ counsel on a contingency fee basis. They did not get other condo owners to join them in the suit. The debtors incurred large amounts for attorney's fees and expert witness fees. A number of the named defendants were voluntarily dismissed by the debtors. During the trial, the debtors offered to dismiss the Blackerby creditors and pay $10,000.00 of their costs.

3

After some negotiation, the debtors bumped this offer up, ultimately agreeing to dismiss the Blackerby creditors and pay $100,000.00 of their costs. The settlement was placed on the record in the Florida litigation on June 29, 2011, but payment details were not.[7] Thereafter, the debtors did not pay any portion of the settlement. Instead, they filed their chapter 7 petition in Alaska on August 24, 2011. Relief from stay was granted to allow the judge in the Florida litigation to render a decision as to the sole remaining defendant, Paradise Shores of Bay County, LLC. The district court found in favor of Paradise Shores and the debtors were denied all relief.[8]

After the debtors filed for bankruptcy, the United States Trustee and the Blackerby creditors filed motions to dismiss their chapter 7 petition. Paradise Shores joined in the motions.

Analysis

The United States Trustee contends the Friebels' petition should be dismissed pursuant to 11 U.S.C. § 707(b)(1), which provides, in part:

> After notice and a hearing, the court, on its own motion or on a motion by the United States Trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it

---

[7] *See* Transcript of Excerpts of Third Day of Trial before the Honorable Richard Smoak, United States District Judge on June 29, 2011.

[8] Blackerby Ex. C27 (Judgment entered in the Florida litigation).

4

> finds that the granting of relief would be an abuse
> of the provisions of this chapter.[9]

Section 707(b)(1) applies only to debtors with "primarily consumer debts." A consumer debt is a "debt incurred by an individual primarily for a personal, family or household purpose."[10] Whether a debt is a consumer or business debt "depends upon the purpose of the debt."[11] Courts make a distinction between consumer and business debt by determining whether a profit motive exists.[12] If such a motive exists, the debt is considered a business debt.

It is well settled that a residential mortgage is a consumer debt.[13] Here, the determinative issue is whether the debts associated with the debtors' condominium purchase are consumer or business debts. The debtors argue that the condominium was purchased as an investment and that their debts are primarily business debts. However, over the course of time their stated intentions with regard to the condominium have been inconsistent. The first page of the loan application Elizabeth signed on June 19, 2007, when the condominium purchase closed, indicated that this property was to be a "second home."[14] There was an option on the loan application to indicate that the loan was for investment purposes, but the

---

[9] 11 U.S.C. § 707(b)(1).

[10] 11 U.S.C. § 101(8).

[11] *Price v. United States Trustee (In re Price)*, 353 F.3d 1135, 1139 (9th Cir. 2004), *citing Zlog v. Kelly (In re Kelly)*, 841 F.2d 908, 913 (9th Cir. 1988).

[12] *Stewart v. United States Trustee (In re Stewart),* 175 F.3d 796, 806 (10th Cir. 1999).

[13] *Kelly*, 841 F.2d at 913.

[14] United States Trustee's Ex. L at 1. Elizabeth had a power of attorney for Joshua, and signed the loan documents on his behalf.

5

debtors did not check this box. Additionally, the mortgage Elizabeth executed contained a second home rider. It provided:

> **6. Occupancy.** Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property.
>
> **8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.[15]

The debtors immediately violated the terms of the second home rider by giving Parker Realty control over occupancy and use of the property.

When asked at trial about the loan documents, Elizabeth explained that she signed these documents when she was extremely jet-lagged. She had flown from Japan to Florida to sign the documents and close on the purchase. She also stated that the provisions

---

[15] *Id.* at 26 (bolded text in original).

in the second home rider were "legal jargon," and that she felt it would be necessary to defer to a real estate expert as to their meaning.  I was unpersuaded by either of Elizabeth's explanations.  She admitted that she read the loan documents and initialed the bottom of each page.  She recalled doing a walk-through of the condominium to verify that everything was in working order.  I do not believe she was so jet-lagged that she could not understand the documents she was signing.  Nor do I find that the second home rider was "legal jargon." It said that the Friebels would "occupy, and shall only use, the Property as [their] second home," for their "exclusive use and enjoyment at all times."[16]  It prohibited the Friebels from placing the unit in a timeshare or rental pool, or giving "any other person any control over the occupancy or use of the Property."[17]  I believe Elizabeth was competent at the time she executed the loan documents.  She read and understood exactly what she was signing.

In fact, the loan documents are consistent with statements the debtors made in the Florida litigation which indicate that the condominium was purchased for personal use. In a deposition taken December 22, 2010, Elizabeth was asked how she found the Paradise Shores property.  She responded:

> I was living in Mexico Beach and fell in love with the town, really loved the beach, and we were about to get married.  So I knew that I wanted to buy something there because it was one of the places that I could see myself after, you know, our Air Force careers going back to and living.  So I started looking in Mexico Beach for places that we could potentially buy.  And there were, I

---

[16] *Id.*

[17] *Id.*

7

> would say, over 40 or 50 different places that I looked at, both old and new places – this was preconstruction at this point – to determine what I thought would be the best place for us.[18]

This testimony was provided more than three years after the Friebels had closed on the condominium, and more than one year after they had taken the condominium off the rental market. Six months later, during the trial in the Florida litigation, Elizabeth gave similar testimony:

> When I was stationed at Tyndall, I basically started renting a place in Mexico Beach, and fell in love with the town. I'm originally from a small town in Hawaii, and it reminded me a lot of home. I liked that it was – had that small-time feel and everything. And during my stay there, myself and, my husband now, but fiancee at the time, were looking to get a piece of property that, you know, once we retire we're able to use, and take advantage of.
>
> We, you know, had just started out our military careers, and both as pilots, we have a ten-year commitment to the Air Force, minimum. So we knew that we were going to be in the military for at least the next ten years, no questions asked. And loved the town and wanted to buy something in it.[19]

---

[18] United States Trustee Ex. H at 4 [Deposition Tr. 11:13-22].

[19] United States Trustee Ex. I at 5 [Trial Tr. at 326:4-16].

When asked why the Friebels had decided to purchase a condominium, Elizabeth stated that they "really liked the idea of establishing roots somewhere so that when we do retire, we have a place to enjoy it."[20]

In September of 2011, the debtors submitted proposed findings of fact and conclusions of law in the Florida litigation. At this point in the litigation, they were representing themselves pro se. Their proposed findings state:

> Plaintiffs, in their late 20's at the time, were Air Force Officers and newlyweds and had purchased what was their first home and what was sold as a brand new residential unit in a luxury condominium building for themselves to have and to use and to rent while serving overseas.[21]

The loan documentation as well as the debtors' statements from the Florida litigation all support a finding that the debtors intended to purchase a home when they bought the Paradise Shores condominium. They wanted a place where they could put down roots and be happy in retirement. Now, however, the debtors allege that their intent in purchasing the condominium changed between 2005, when they signed the purchase agreement, and June of 2007 when the sale closed. The debtors say the circumstances of their life changed dramatically from the time they agreed to purchase the unit – they got married and moved to Japan, the real estate market dropped, and it became apparent that they would never live

---

[20] *Id.* at 6 [Trial Tr. at 332:11-13].

[21] United States Trustee Ex. J at 1-2. A footnote to this statement says, "It has long been recognized in Florida that the sale and purchase of a home is one of the most significant undertakings in which a person will ever be involved in a lifetime." *Id.* at 2 n.2.

9

or retire in Mexico Beach.[22] To salvage their sizeable downpayment, the Friebels opted to make the condominium a vacation rental that would generate income for them.[23]

The Friebels' statements about a change of intent are not persuasive. First, I think their intent at the inception of the purchase is determinative to the issue of whether the condominium is a consumer or business debt. Moreover, their alleged change of intent is belied by the testimony and proposed findings they submitted in the Florida litigation in 2011, well after the condo sale closed. As noted above, all of these statements, as well as the loan documentation executed at closing, support the finding that the condominium was intended to be a second home and, ultimately, a retirement home for the Friebels.

The reasons the Friebels provide for their purported change of intent seem arbitrary and irrational. Elizabeth stated that her intent changed because she got married. However, the Friebels were married in December of 2004, seven months before they executed the purchase agreement. Elizabeth also claimed her intent changed when she moved from Mexico Beach to Japan. But her testimony in the Florida litigation reflects that she knew they would be stationed overseas, and that they intended to return to the condominium upon retirement from the Air Force. Elizabeth also says her intent changed as "the condominium was finally built and the real estate market began to drop."[24] The purchase agreement the Friebels executed in 2005 contemplated the building of a condominium. It could be no surprise that one was actually built or that real estate markets

---

[22] United States Trustee Ex. E at 2 (Decl. of Elizabeth Friebel).

[23] *Id.*

[24] *Id.*

10

change over time. In my opinion, all of the debtors' arguments regarding their change of intent are simply attempts to rationalize their current position in this court, *i.e.*, that the condominium was a business investment. Undoubtedly, the debtors had some business purpose in purchasing the condominium. They hoped to earn rental income to defray a portion of their purchase costs. But their primary purpose was to obtain a home to return to in retirement following their Air Force careers. As such, the debtors' condominium-related liabilities are consumer debt, rather than business debt. The Friebels are consumer debtors, subject to the provisions of § 707(b)(1).

The debtors have cited a decision from Ohio, *In re Swartzertruber*,[25] to support their contention that they are business debtors. In *Swartzertruber*, the court found a debt for a Florida condominium to be a business debt, despite the fact that the debtors declared the condo to be a second home and their mortgage contained a provision that the property was not to be used for commercial purposes. There are significant differences between the facts in *Swartzertruber* and the case at bar. First, Swartzertruber could not pay for the property without rental income. Here, the debtors have the means to finance and maintain the Florida property without rental income. Second, in *Swartzertruber* the condominium was much smaller, just 400 square feet, and the debtor's family included three small children. They could not comfortably live in the condominium. Here, the debtors had no children at the time they purchased the 1,000 square foot condominium, and could have lived comfortably within it. Third, Swartzertruber consistently stated that the condominium was purchased for

---

[25] 2009 WL 2873003 (Bankr. N.D. Ohio).

11

investment purposes. Here, the debtors have made frequent admissions as to their intent to use the condo as a retirement home. *Swartzertruber* does not aid the debtors.

The debtors are substantially above-median. A presumption of abuse arises under § 707(b)(2)(A), because their current monthly disposable income, multiplied by 60, is the sum of $594,120.00.[26] This sum is greater than 25% of the debtors' non-priority unsecured claims ($157,795.33).[27] The debtors fail the means test. They must convert their case or face dismissal.

Because the presumption of abuse arises under § 707(b)(2)(A)(i), the court will not consider the circumstances listed under § 707(b)(3)(A) or (B), *i.e.,* whether the debtors filed their petition in bad faith or whether the totality of circumstances of the debtors' financial situation demonstrates abuse. The court is to consider those circumstances only when the presumption of abuse does not arise or is rebutted.[28] Here, because the presumption does arise and has *not* been rebutted, the court will not perform a § 707(b)(3) analysis. The United States Trustee's motion to dismiss on these alternative grounds, and the Blackerby creditors' motion to dismiss, which was brought solely on these grounds, will be denied without prejudice.

Conclusion

---

[26] Decl. of K. Hill, filed Nov. 28, 2011 (Docket No. 40), Ex. 1 at 7, line 51.

[27] 11 U.S.C. § 707(b)(2)(A)(i)(I).

[28] 11 U.S.C. § 707(b)(3) only applies "in a case in which the presumption [of abuse] in paragraph (2)(A)(i) does not arise or is rebutted."

The Friebels are consumer debtors. They purchased the Florida condominium intending to use it as a second home and a retirement home. All debts associated with the condominium are, therefore, consumer debts. Because the debtors' income is substantially above-median, the filing of this chapter 7 petition is a presumed abuse under 11 U.S.C. § 707(b)(1). The United States Trustee's motion will be granted, and this case will be dismissed, unless the Friebels file a motion to convert to chapter 13 within fourteen days.

An order and judgment will be entered consistent with this memorandum.

DATED:  May 15, 2011.

BY THE COURT

 /s/ Donald MacDonald IV  
DONALD MacDONALD IV  
United States Bankruptcy Judge

Serve:    D. Bundy, Esq.  
            Kay Hill, Esq.  
            F. Delia, Esq.  
            M. Schofield, Esq.  
            L. Compton, Trustee

05/15/12